STATE OF FLORIDA, *Ex Rel.* JOHN B. JOHNSON, *Attorney General, Relator,* v. PAUL R. JOHNS, DAVID FESSLER, R. A. YOUNG, M. C. FROST, AND I. T. PARKER, *Respondents.*

Division B.

Quo Warranto.

Original Jurisdiction.

STATEMENT.

There was filed in this court the following:

"INFORMATION.

"John B. Johnson, Attorney General of the State of Florida, who sues for the people of said State in this behalf, comes into court here on this day and for said State and in the name and by the authority thereof gives the court here to understand and be informed that Paul R. Johns, David

Fessler, R. A. Young, M. C. Frost, and I. T. Parker have for the space of ninety (90) days and more last past usurped and do usurp to be a municipal corporation under the name of the City of Hollywood, in Broward County, Florida; and that they claim to be the City Commissioners of said City, and as such do perform and exercise all the liberties, privileges and franchises of an incorporated city, usurping to be a municipal corporation to the prejudice and wrong of the people of the State of Florida; and the Attorney General further gives the court here to understand and be informed that said pretended corporation of the City of Hollywood has never been organized according to law and is without legal existence, and that the statute under which its corporate existence is claimed is unconstitutional and void, and that the defendants, the persons attempting to hold such offices and enjoy such franchises, do so without lawful authority, to the prejudice and wrong of the people of the State of Florida.

''WHEREUPON, the said Attorney General for the said State, in the name and by the authority thereof, prays the consideration of the court here in the premises and due process of law in this behalf to Paul R. Johns, David Fessler, R. A. Young, M. C. Frost, and I. T. Parker to answer to the said State by what warrant or authority of law they claim to exercise offices, franchises, liberties and powers as aforesaid.

J. B. JOHNSON,
Attorney General of the State of Florida.

VINCENT C. GIBLIN,
Attorney for said Attorney General.''

The following writ was issued:

"IN THE NAME OF THE STATE OF FLORIDA,

TO ALL AND SINGULAR THE SHERIFFS OF THE STATE OF FLORIDA:

"You are hereby commanded to summons the defendants, Paul R. Johns, David Fessler, R. A. Young, M. C. Frost, and I. T. Parker, that they be before this Court on Monday, April 12th, 1926, to show quo warranto (by what right), or by what warrant or authority of law, they claim to exercise offices, franchises, liberties and powers as the City of Hollywood, a pretended corporation .

"Witness my hand and the seal of the Supreme Court at Tallahassee, the Capital of the State, this 6th day of April, A. D. 1926.

G. T. WHITFIELD,<br>Clerk of the Supreme Court.''

Other proceedings appear in the opinion.

WHITFIELD, P. J.—On the relation of the Attorney General upon allegations of the usurpation of municipal powers and offices of a pretended municipality, a writ in quo warranto proceedings was issued from this court commanding Paul R. Johns, David Fessler, R. A. Young, M. C. Frost and I. T. Parker, to answer to the State by what warrant or authority of law they claim to exercise the offices, franchises, liberties and powers as city commissioners of the City of Hollywood, Broward County, Florida. See 4 Cow. (N. Y.) 106, Note: Town of Enterprise v. State, 29 Fla. 128, 10 South. Rep. 740; 32 Fla. 545. The joint and several answers of the respondents follows:

"Now comes the defendants, Paul R. John, David Fessler, R. A. Young, M. C. Frost and I. T. Parker, and each of them, by their attorney, and file this, their joint and several answer to the information in the above styled cause, and for answer to said information, the defendants, and

each of them, say that they enjoy and perform the duty, power and franchises of City Commissioners of the City of Hollywood, Florida, by virtue of Chapter 11519 of the Acts of the Legislature of the State of Florida, approved November 25th, 1925, and the said defendants, and each of them, further say that the said act is in all respects constitutional and valid, and lawfully constitutes a municipal corporation, under the laws of Florida, known as the City of Hollywood, in Broward County, Florida, and that the defendants, and each of them, hold their respective offices in said City of Hollywood in conformity with and by virtue of the provisions of said Chapter, as contained in said Legislative Act, and that the said defendants have vested in them, as such City Commissioners, all powers of said City of Hollywood.''

The relator presented the following demurrer to the answer:

''1.   That Chapter 11519 of the Acts of the Legislature of the State of Florida, approved November 25, 1925, under and pursuant to which the defendants purport to perform and enjoy the duties, powers and franchises of city commissioners of the municipal corporation, as in and by their said joint and several answer alleged and set forth, is invalid and void, in that Section 1 of Article III thereof attempts, seeks and purports to deprive the people of the community embraced and included within the purported boundaries of the municipality attempted to have been created and organized in and by said act of their inherent and organic right of local self-government.

''2.   That Chapter 11519 of the Acts of the Legislature of the State of Florida, approved November 25, 1925, under and pursuant to which the defendants purport to perform and enjoy the duties, powers and franchises of city commissioners of the municipal corporation, as in and by

their said joint and several answer alleged and set forth, is invalid and void, in that Section 1, of Article III thereof attempts, seeks and purports to deprive the people of the community embraced and included within the purported boundaries of the municipality attempted to have been created and organized in and by said act of their inherent and organic right to choose the officers of their local government."

Chapter 11519, Acts of 1925, the title being "AN ACT to Create, Establish and Organize a Municipality in the County of Broward and State of Florida, to be Known and Designated as the City of Hollywood and to Define Its Territorial Boundaries, and to Provide for Its Government, Jurisdiction, Powers, Franchises and Privileges," contains the following:

## "ARTICLE III.

### City Commission.

Section 1. *Created.*—The corporate authority of the City of Hollywood shall be vested in and governed by a Commission consisting of five members whose term of office shall be for a period of four years.

"J. W. Young, David Fressler, J. M. Young, Paul R. Johns and R. A. Young shall constitute the first Commission, and they shall hold office for four years and until their successors are elected and qualified. The first election of Commissioners shall be held on the first Tuesday in November in the year Nineteen Hundred and Twenty-nine, and every four years thereafter. Commissioners shall take office at noon on the third day after their election. Any vacancy on the Commission shall be filled for the unexpired term by the remaining Commissioners."

Counsel for the relator contends that the quoted statutory provision is unconstitutional "in that it deprives the peo-

ple of the City of Hollywood of the right of local self-government.''

The principle of local self-government is predicated upon the theory that the citizens of each municipality or governmental subdivision of a State should determine their own local public regulations and select their own local officials; but the extent to which and the manner in which the principle may be made applicable, depends upon the provisions of controlling organic and statutory laws of the particular state.   See Mayor, etc. of City of Americus v. Perry, 114 Ga. 871, 40 S. E. Rep. 1004, 57 L. R. A. 230, 6 R. C. L. 23; 21 Fla. 280; 44 Ohio St. 348, 89 S. W. 985.   The legislature has plenary power over municipalities except as restrained by the Constitution.   Sec. 8, Art. 8, Const.   Municipal officers are statutory officers subject to legislative action; and the right to vote in municipal elections is controlled by statute and not by organic provisions relating to State elections.   See State ex rel. Attorney General v. Dillon, 32 Fla. 545, 14 South. Rep. 383. Municipal corporations have, in the absence of constitutional provisions safeguarding it to them, no inherent right of self-government which is beyond the legislative control of the State, 262 U. S. 182, 43 Sup. Ct. Rep. 534; 29 A. L. R. 1471, 55 L. R. A. 740; 48 L. R. A. 465; 50 L. R. A. 330; 1 Dillon Munic. Corp. (5th Ed.), Sec. 98.

Whatever may be the holdings in other States that the citizens of the several municipalities in a State have the inherent right to select their municipal officers, and that such right cannot be abrogated by statutes unless authorized by the constitution of the State, (12 C. J. 754), in this State the herein quoted provisions of the organic law give to the legislature express power to establish municipalities and to provide for their government, which includes authority to determine the form of the municipal

State of Fla. ex rel. Johnson v. Johns et al.—Opinion of Court.

government and to designate the persons or the method of
selecting the persons who shall exercise the municipal
authority when no other provision of the constitution is
thereby violated; and the provisions of the statute herein
challenged, that the corporate authority of the municipality
shall be vested in a commission consisting of five members
whose term of office shall be four years, and that designated
persons shall constitute the first commission to hold office
for four years and until their successors are elected and
qualified, and that any vacancy on the commission shall be
filled for the unexpired term by the remaining commission,
are authorized by Section 8, Article VIII of the State Con-
stitution and such provisions do not violate any other sec-
tion of the constitution.

Section 24 of the Declaration of Rights contains the fol-
lowing:

> "This enumeration of rights shall not be con-
> strued to impair or deny others retained by the
> people."

This organic section does not so qualify or modify the
express provision of Section 8, Article VIII, as to deprive
the legislature of any power conferred by the latter sec-
tion; and the power exercised in this case by the legislature
is clearly within the scope of its express authority.

The constitution does secure "certain inalienable rights,
among which are those of enjoying and defending life and
liberty, acquiring, possessing and protecting property, and
pursuing happiness and obtaining safety," and provides
that "all political power is inherent in the people. Govern-
ment is instituted for the protection, security and benefit
of the citizens, and they have the right to alter or amend
the same whenever the public good may require" (subject
to the Federal Government). Secs. 1, 2, Dec. of Rights.
The Constitution also requires the legislature to "establish

a uniform system of county and municipal government, which shall be applicable except'' where inconsistent local or special laws are enacted, (Section 24 Article III) and further provides that ''the legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time.'' Sec. 8, Art. VIII. The organic law contains no express provision relative to the right of ''local self government'' and the provision of Section 27, Article III, requiring officers to be elected by the people or appointed by the Governor is expressly confined to ''all State and county officers not otherwise provided for by the Constitution.'' Such provision, therefore, does not apply to municipal officers. The corresponding provision of the constitution of 1868 included municipal officers.

Section 1, Article III of the constitution provides that ''The legislative authority of this State shall be vested in a Senate and House of Representatives, which shall be designated 'The Legislature of the State of Florida','' Under this provision the legislature may exercise any lawmaking power that is not forbidden by the organic law of the land. Stone v. State, 71 Fla. 514, text 517, 71 South. Rep. 634.

The lawmaking power of the legislature of a State is subject only to the limitations provided in the State and Federal Constitutions; and no duly enacted statute should be judicially declared to be inoperative on the ground that it violates organic law, unless it clearly appears beyond all reasonable doubt that under any rational view that may be taken of the statute, it is in positive conflict with some identified or designated provision of constitutional law.

A statute should be so construed and applied as to make

it valid and effective if its language does not exclude such an interpretation.

Where a statute does not violate the Federal or State Constitution, the legislative will is supreme, and its policy is not subject to judicial review. The courts have no veto power and do not assume to regulate State policy; but they recognize and enforce the policy of the law as expressed in valid enactments, and decline to enforce statutes only when to do so would violate organic law. City of Jacksonville v. Bowden, 67 Fla. 181, 64 South. Rep. 769.

Whatever the phrase ''local self government'' may mean in government, the constitution of this State contains no express provision with reference thereto and there are no provisions of the organic law that so modify the express provision of Section 8, Article VIII of the Constitution that ''the legislature shall have power to establish and to abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time,'' as to withold from the legislature the power to designate by statute the particular persons who shall exercise the power of a municipality created by statute, such power to designate being a part of or incidental to the quoted organic power to establish municipalities, to provide for their government and to prescribe their jurisdiction and powers. See 1 McQuillan Munic. Corp. Sec. 176.

The court should not declare a statute to be void or inoperative on the ground that it is opposed to a spirit that is supposed to pervade the constitution, or because the statute is considered unjust or unwise or impolitic. Wooten v. State, 24 Fla. 335, 5 South. Rep. 39; Cooley's Const. Lim. (7th ed) p. 240; 12 C. J. 702; 6 R. C. L. 104; 3 A. L. R. 270; 199 Pa. 534, 53 L. R. A. 837.

In exercising the powers expressly conferred by Section

8, Article VIII, the legislature must not violate any other provision of organic law; but no other provision or organic law is violated by the quoted statute which designates the persons in whom the corporate authority of the city shall be vested. "The principle of local self government" is not operative to nullify a legislative enactment that does not violate any express or implied provision of the State or Federal constitution. The enactment here challenged is clearly authorized by the quoted organic provision, and it does not abridge any organic right.

The demurrer to the answer is overruled and the writ quashed.

TERRELL AND BUFORD, J. J., concur.

ELLIS AND STRUM, J. J., concur in the opinion.

BROWN, C. J., dissents.

BROWN, C. J., dissenting:

Although the persons named in the act as City Commissioners for the first four years may be in every way qualified for their official duties and precisely the men whom the citizens of the community, if they had been allowed to, would have selected for these positions, I cannot think that the action of the legislature in providing that the governing body of the city of Hollywood for the first four years of its corporate existence should consist of persons appointed by the legislature and named in the act, all vacancies occurring to be filled by the remaining members of such board, is a legitimate exercise of legislative power. The exact question here presented seems to be a new one in this State, and is not free from difficulty.

While the legislature could no doubt, as an incident to

its legislative power, name and appoint the members of the governing board to act temporarily until such reasonable and convenient time as might be required for the primary organization of the municipality, and the selection by the qualified voters thereof of the members of such governing body who were to hold for the first full term, I am inclined to the opinion that it cannot go beyond the field of legislative power and control through its agents the administration and government of a town or city of this State for so long a period as four years, thus depriving the city of all voice, for that considerable period of time, in the selection its own governing officials  Even if a local community of this State has no inherent right of local self-government which the legislature is bound to respect, it would appear that the legislature cannot exercise the executive and governmental functions of a town or city, under our constitution; either directly or through the agency of persons selected and appointed by it.  Our constitution divides the powers of government into three grand divisions—the legislative, executive and judicial—and expressly prohibits either of these departments from exercising any power belonging to either of the others.  If the legislature has the power to govern a city through its appointed agents for four years, it may also do so for ten years, or indefinitely.  The writer realizes that the authorities are divided on this question, but inclines to the view expressed in those decisions which hold that this is not a legitimate exercise of legislative power.  See 12 C. J. 836-8, and cases cited: 1 McQuillan Munic. Corp. 399-403.

The City Commission appointed by the legislature in this instance is vested with the usual power to levy taxes, require the payment of business and occupational licenses, and expend the monies of the municipality.  Thus the citizens of the municipality must endure taxation without

representation for a period of four years. If the legislature could do this in this instance, can it not deprive every town and city in this State of every vestige of local self-government, and impose upon them the rule of governing bodies in whose selection they have no voice—a principle utterly at variance to American history, traditions and ideals of government.

I fully realize that Section 8 of Article VIII of the Constitution of 1885 gave the legislature very broad powers "to establish and abolish municipalities, to provide for their government, to prescribe their jurisdiction and powers, and to alter or amend the same at any time;" but all these powers are granted with reference to "municipalities," and, according to a sound and well accepted rule of constitutional construction, this word must be interpreted to mean what it was understood to mean by the makers of the constitution—it must be interpreted in the light of the commonly accepted meaning of the word "municipality" at the time the constitution was adopted. And in arriving at this, it is permissible to consider the previous history of our State and country and of our race of people; their conception of what a municipality was; as well as in the light of actual conditions existing when this constitution was framed. Applying these rules, there can be no doubt that the makers of the constitution had in mind, when using this word, municipal corporations with certain powers of local self-government, among them the power of selection of their governing body, which were and had been for centuries an essential feature of municipal corporations of this country, including Florida, and in the British Isles, from whence so many of our ancestors came. Even the dictionary definition of the word "municipality" embrace the feature of local self-government as a distinguishing one.

If this be true, could the constitution makers, when they vested in the legislature the power to create a municipality, prescribe its form of government, etc., have meant or intended that the legislature should have the power to create and prescribe any form of city government, any sort of legislative oligarchy, entirely irresponsible to and beyond the influence of the people most intimately concerned, and call that a municipality within the meaning of the constitution? Could the legislature thus "speak the word of promise to the ear and break it to our hope?" My thought is that no matter by what name it may be called, a city or town that has no powers of local self-government, that has no power to elect its own governing body, who are to administer its local affairs, which primarily concern the people of that particular community, is not a municipal corporation as that term has been understood in America and among Anglo-Saxon peoples anywhere in the world for many centuries. It may be an agency or department of the State government for local administration, but it is not a municipality. The shell may be there, but the soul is gone. The makers of the Constitution of 1885 were the descendants of men who had shed their blood in defense of their conception of the right to local self-government; they were acquainted with the history of our people, and our constitution as a whole assumes the existence of this right, while not expressly protecting it except as to county government, and except also, possibly, in a general way, by the first two sections of the Bill of Rights, which assert that "all men are equal before the law and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing happiness and obtaining safety;" and "all political power is inherent in the people;" and again, "this enunciation of rights shall not

be construed to impair or deny others retained by the people.''

Permit me to quote certain paragraphs from the opinion of Mr. Justice Cooley, one of the great writers on constitutional principles, in the case of People v. Hurlbut, 24 Mich. 44: ''If we look into the several state constitutions to see what verbal restrictions have heretofore been placed upon legislative authority in this regard; we shall find them very few and simple. We have taken great pains to surround the life, liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar · protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that there are certain fundamental principles in our general framework of government, which are within the contemplation of the people when they agree upon the written character, subject to which the delegations of authority to the several departments of government have been made. .That this last is the case, appears to me too plain for serious controversy. The implied restrictions upon the power of the legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The Constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations.

''The circumstances from which these implications arise are: *First,* that the Constitution has been adopted in view of a system of local government, well understood and tol-

erably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, *second,* that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system.

"DeTocqueville speaks of our system of local government as the *American system,* and contrasts it forcibly with the French idea of centralization, under the influence of which constitutional freedom has hitherto proved impossible. Democracy in America, chapter 5. Lieber makes the same comparison, and shows that a centralized government, though by representatives freely chosen, must be despotic, as any other form of centralization necessarily is. 'Self-government,' he says, 'means everything for the people and by the people, considered as the totality of organic institutions, constantly evolving in their character as all organic life is; but not a dictatorial multitude. Dictating is the rule of the army, not of liberty; it is the destruction of individuality.' Civil Liberty and Self-Government. chap. 21.   *   *   *

"It is not the accepted theory that the states have received delegations of power from independent towns; but the theory is, on the other hand, that the state governments precede the local, create the latter at discretion, and endow them with corporate life. But, historically, it is as difficult to prove this theory as it would be to demonstrate that the origin of government is in compact, or that title to property comes from occupancy. The historical fact is, that local governments universally, in this country, were either simultaneous with, or preceded, the more central authority.

　　*　　*　　*　　*　　*　　*　　*

"Such are the historical facts regarding local govern-

ment in America. Our traditions, practice and expectations have all been in one direction. And when we go beyond the general view to inquire into the details of authority, we find that it has included the power to choose in some form the persons who are to administer the local regulations. Instances to the contrary, except where the power to be administered was properly a state power, have been purely exceptional. * * *

"In view of these historical facts, and of these general principles, the question recurs whether our state constitution can be so construed as to confer upon the legislature the power to appoint, for the municipalities, the officers who are to manage the property, interests, and rights in which their own people alone are concerned. If it can be, it involves these consequences: As there is no provision requiring the legislative interference to be upon any general system, it can and may be partial and purely arbitrary. As there is nothing requiring the persons appointed to be citizens of the locality, they can and may be sent in from abroad, and it is not a remote possibility that self-government of towns may make way for a government by such influences as can force themselves upon the legislative notice at Lansing. As the municipal corporation will have no control, except such as the state may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid, and the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members in general are not to feel the burden, a compensation such as would not be awarded by the people, who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid on the one and drawn on the other. * * * * * * *

All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the state are tenable. * * * ''The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but if it were sought to establish such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the constitution the power to establish it was prohibited; it would be necessary, on the other hand, to point out to them where and by what unguarded words the power had been conferred. Some things are too plain to be written. If this charter of state government which we call a constitution, were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, the precepts which have come from the revolutions which overturned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so,—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain, but the living spirit, that which gives it force and attraction, which makes it valuable and draws to it the affections of the people, that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been wanting in the support and vitality which these alone can give,—this living and breathing spirit, which supplies the interpretation of the words of the written charter, would be utterly lost and gone. * * *

"The state may mould local institutions according to its views of policy or expediency; but local government is a matter of absolute right; and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discretion sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs or no control at all.

"What I say here is with the utmost respect and deference to the legislative department; even though the task I am called upon to perform is to give reasons why a blow aimed at the foundation of our structure of liberty should be warded off. Nevertheless, when the state reaches out and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon and compelled to take up and defend the plainest and most primary axioms of free government, as if even in Anglican liberty, which has been gained step by step, through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established."

Even under the iron rule of Rome, the cities of the Roman Empire were granted a certain measure of local self-government. And in England, and the British Isles generally, the right of local self-government of cities, boroughs and towns, were secured and built up as early as the days of Alfred, proving to be one of the bulwarks of liberty in that country, and it was not until the 15th century that the practice of granting charters to cities was inaugurated. These charters

were not so much a grant of new powers as they were a recognition and guaranty of the rights of local self- government which had long existed.

By the Great Charter, King John was required to confirm some of the charters granted during his reign, and section 16 of the Magna Charta reads as follows: "And the city of London shall have all its ancient liberties and free customs, as well by land as by water; furthermore, we will and grant that all other cities and boroughs and towns and ports shall have all their liberties and free customs."

Municipal local self-government is, as Judge Cooley has tersely said, "of common law origin, and having no less than common-law franchises." Our State, long before the constitution of 1885 was framed, had formally adopted the English common-law where not inconsistent with our own legal system.

Is not this time-honored right of the people of municipal corporations to choose their own local officers one of the rights retained by the people under section 24 of our Declaration of Rights? Nowhere does our constitution expressly confer the power upon the legislature to take away this right, nor is the right of local self-government anywhere forbidden by that instrument; and the framers of the constitution must have contemplated that the then existing right of municipal corporations to choose their local officers to administer their local affairs, would continue as the one great essential feature of municipalities in this State.

I realize that the views hereinabove expressed are those of the minority (though that minority contains such names as Cooley, Gray and McQuillin) and that the weight of authority in this country supports the views expressed in the able opinion of Mr. JUSTICE WHITFIELD. There is, however, one pronouncement by this court, in the case of

Kaufman v. City of Tallahassee, 84 Fla. 634, 94 So. 697, which leans toward the construction I contend for. In that case, this court, speaking through MR. JUSTICE ELLIS, said: "It is unnecessary to discuss the question of whether a municipality is a political agency or subdivision of the State and in its activities acts always in a governmental capacity. While the drift of judicial thought, as tested by many decisions, seems to be toward the opinion that a city has no inherent right to local self-government and is a mere agency of the state to be governed and controlled by the legislature even through its own agents or appointees, and that view finds some color in the language of our constitution, * * * this court has consistently adhered to the doctrine of municipal liberty in the administration of local affairs."

While invasions of the right of municipal local selfgovernment on the part of the legislatures have been comparatively few in this country up to the present time, these experiments have, in many instances, resulted disastrously and have proven that it is dangerous to depart from this time-tested principle which has grown with our growth and has become, as it were, a part of the brawn and sinew of the American system of government.

The authorities on this subject will be found collated and reviewed in the able briefs filed in this case, and also in Vol. 1, McQuillin Munic. Corp., pp. 107, 141, 153, 240, 376 to 407; Vol. 1, Dillon Munic. Corp. (5th Ed.), pp. 154-181; 28 Cyc., 282-286, 291-6; Cooley Const. Lim. 225; 12 C. J. 754.

For the reasons above pointed out, I think the demurrer of the relator to the answer of the respondent should be sustained.